JOSEPH MARINI, PLAINTIFF-RESPONDENT, v.
ALICE IRELAND, DEFENDANT-APPELLANT.

Argued February 16, 1970—Decided May 18, 1970.

*Mr. Gordon V. Lewis* argued the cause for the appellant (*Mr. David H. Dugan, III,* Director, Camden Regional Legal Services, Inc., attorney; *Messrs. Joseph V. Ippolito* and *Kenneth Meiser,* on the brief).

*Mr. Bartholomew A. Sheehan, Jr.* argued the cause for the respondent (*Messrs. Hyland, Davis & Reberkenny,* attorneys).

*Mr. Richard J. Pilch* argued the cause *amicus curiae* for the New Jersey State Office of Legal Services (*Mr. James D. Coffee,* Director).

The opinion of the Court was delivered by

HANEMAN, J. This matter concerns the appealability of County District Court landlord and tenant dispossess judgments; the scope of a landlord's duty to make repairs; and the right to offset the cost of such repairs against accruing rent on the failure of the landlord to make same, if found to be required.

On or about April 2, 1969, plaintiff, landlord, and defendant, tenant, entered into a one-year lease for an apartment located in a two-family duplex building at 503-B Rand Street, Camden, New Jersey. The annual rent of $1,140 was agreed to be paid in monthly installments of $95. The lease incorporated a covenant of quiet enjoyment but did not include a specific covenant for repairs.

On or about June 25, 1969, defendant alleges that she discovered that the toilet in the leased apartment was cracked and water was leaking onto the bathroom floor. She further alleges that repeated attempts to inform plaintiff of this condition were unsuccessful. On or about June 27, 1969, defendant hired one Karl T. Bittner, a registered plumber, to repair the toilet. Bittner repaired the toilet at a cost of $85.72, which the tenant paid.

On July 15, 1969, defendant mailed plaintiff a check for $9.28 together with the receipt for $85.72 in payment of

the July rent. Plaintiff challenged the offsetting of the cost of the repair and demanded the outstanding $85.72.

When his demands were refused, plaintiff instituted a summary dispossess action for nonpayment of rent in the Camden County District Court pursuant to *N. J. S. A.* 2A:18–53(b) alleging the nonpayment of the July rent in the amount of $85.72 and August rent of $95. A hearing was had on August 15, 1969. Plaintiff argued that he was entitled to the $85.72 because he had no duty to make repairs and consequently, defendant's payment of the cost of repair could not be offset against rent.

The judge conceived the issue as entirely a legal one and determined that the facts which defendant alleged did not create a duty upon the landlord to make repairs. Thus, without trying out the issues tendered by defendant, he found a default in payment of rent of $85.72 (July) and $95 (August) plus costs and rendered a judgment for possession. Defendant appealed to the Appellate Division.

On August 29, 1969, a judge of the Appellate Division granted a temporary stay of the judgment for possession and the warrant of eviction. The Appellate Division granted a stay pending appeal on September 23, 1969 and ordered defendant to pay all the rents then due except the contested July rent. The Appellate Division also then denied plaintiff's cross-motion to dismiss the appeal. Before the Appellate Division heard argument, this Court certified the case on its own motion. *R.* 2:12–1.

The issues which evolve on this appeal are: Did defendant's claimed right to offset her cost of repairs against rent raise a "jurisdictional" issue? If the answer to that query is in the affirmative, did the landlord have a duty to repair and may the issue of failure to comply with such duty be raised in a dispossess action? Also involved in the latter question is the right of the tenant to make repairs upon the landlord's failure to so do and the right to offset the cost thereof against rent.

*N. J. S. A.* 2A:18–53 provides in part:

"Any lessee or tenant * * * of any houses, buildings, lands or tenements, * * * may be removed from such premises by the county district court of the county within which such premises are situated, in an action in the following cases:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"b. Where such person shall hold over after a default in the payment of rent, pursuant to the agreement under which the premises are held."

*N. J. S. A.* 2A:18–59 reads:

"Proceedings had by virtue of this article shall not be appealable except on the ground of lack of jurisdiction. The landlord, however, shall remain liable in a civil action for unlawful proceedings under this article."

As noted, *N. J. S. A.* 2A:18–59 permits review of the County District Court's judgment only on the question of lack of jurisdiction. Plaintiff rationalizes that as defendant acknowledges that the rent asserted by plaintiff to be due for the month of July was not paid in full as provided in the lease, a defense grounded upon an allegation that the unpaid balance is not owing raises a "meritorious" issue. He states that defendant's contest of the *amount* due directs an attack upon plaintiff's right to possession rather than an attack upon the jurisdictional basis of his action. Plaintiff argues that the admitted failure to pay *in full* is, in the language of the statute, a *"default"* and vests the County District Court with jurisdiction to order a removal of the tenant.

Defendant on the other hand, contends that the County District Court has jurisdiction in dispossess actions only in those factual complexes specified in *N. J. S. A.* 2A:18–53 — here, for a "default in the payment of rent." The issue of the *amount of rent due,* says defendant, raising as it does the issue of the default alleged by the complaint, is directed at the jurisdiction of the County District Court and a determina-

tion rejecting her defense of *non-default,* in whole or part, is therefore appealable under *N. J. S. A.* 2A:18–59.

■ The County District Court in the present matter, is vested with jurisdiction as noted, only where there exists a rent default. The complaint must delineate specific allegations of fact giving rise to such a default.

While dealing with the following cases cited in connection with the foregoing, it must be remembered that originally an action for possession was commenced before a justice of the peace by filing an affidavit. Later the jurisdiction was transferred to the District Court, but the action continued to be commenced by the filing of an affidavit. In *Earl v. Krug Baking Co.,* 22 *N. J. Misc.* 424 (Cir. Ct. 1944), the court said in that connection at *p.* 425:

> "Summary proceedings in the district court for the dispossession of tenants may be described as a statutory substitute for the common law action in ejectment, and although the proceedings are cmomenced by the filing of the jurisdictional affidavit, that affidavit is nonetheless a complaint in the ordinary acceptation of the term."

Presently the affidavit has been superseded by a complaint. *R.* 6:3–1. What is said in the following cases concerning affidavits is equally applicable to presently employed complaints. As early as *Fowler v. Roe,* 25 *N. J. L.* 549 (Sup. Ct. 1856), the court said, at *p.* 551:

> "In this summary proceeding before a justice of the peace, to turn one man out of the possession of the premises he occupies, and put another in, the power is delegated by special statutory authority to a court having no jurisdiction to try the title to lands, and can only be exercised where all the prerequisites to its exercise prescribed by the statute appear to exist, and are shown to have been complied with."

*Fowler, supra,* also held at *p.* 550, that it must appear from the allegations of the affidavit:

> "1. That the relation of landlord and tenant exists.
> "2. That default has been made by the tenant in the payment of rent, according to the terms of the agreement or demise under which he holds.

"3. That there are no goods of the tenant on the premises out of which the rent due can be made by distress.

"4. That three days' notice in writing has been served by the person entitled to the rent, on the person owing the same, requiring payment or possession."

And again in *Schuyler v. Trefren,* 26 *N. J. L.* 213 (Sup. Ct. 1857), the court said:

"The proceeding is summary. and the jurisdiction is special, limited and statutory; and every essential to its proper exercise must appear to have been complied with."

In *Vineland Shopping Center, Inc. v. DeMarco,* 35 *N. J.* 459 (1961), this Court said at *p.* 464 in reference to substantiating proof of the pleaded jurisdictional facts:

"The established principle is that the trial court had jurisdiction if there was evidence from which it could find a statutory basis for removal. If that test is met, the judgment must be affirmed even though it is otherwise infected with error."

The jurisdictional issue, *i. e.,* the statutory basis for removal, can be twice raised in a dispossess action. First, by motion directed at the complaint for failure to accurately allege the necessary facts with particularity. Second, on trial for failure to adduce adequate proof to corroborate the allegations of the complaint. If the complaint contains adequate factual allegations of default, the issue can be resolved only when proof has been adduced. Failure to furnish either such allegations in the complaint or proof on the trial, is sufficient ground to warrant dismissal for lack of jurisdiction.

As noted in *Vineland Shopping Center, Inc. v. DeMarco, supra,* at *p.* 464, our cases have hewed a line separating the "jurisdictional" issue from the meritorious issue. Confusion arises from this jurisdictional-meritorious dichotomy by reason of the fact that the same proof is required and goes to the same crucial element in each, *i. e.,* proof of the default in rent as alleged in the complaint. Whatever

"jurisdiction" means in other settings, here it uniquely connotes the existence of one of the factual situations delineated in *N. J. S. A.* 2A:18–53. It follows that a finding, by the judge, that there is a default as alleged by the landlord, does not dispose of the meritorious issue alone. It as well disposes of the jurisdictional issue.

The jurisdictional issue of "default" encompasses the question of whether the amount of rent alleged to be in default, is due, unpaid and *owing,* not only whether it is due and unpaid. The mere fact of the tenant's failure to pay rent in full as provided in the lease is not in and of itself a sufficient fact to meet the statutory jurisdictional requisite. Thus a tenant's evidence in substantiation of a defense that there is no default or that the default is not in the amount alleged by the landlord, is admissible on the jurisdictional issue. Consideration must be given not only to a legal defense but as well to an equitable excuse for non-payment, such as confession and avoidance, which would relieve the tenant of the duty of paying and hence make the unpaid rent in whole or part due but not owing and thus not in "default."

That the County District Court "must accept any equitable issue offered to defeat an action within its jurisdiction or to avoid a separate defense to such action" was established by *Vineland Shopping Center, Inc. v. DeMarco, supra, p.* 469. See also *Carteret Properties v. Variety Donuts, Inc.,* 49 *N. J.* 116, 124 (1967). This duty is imposed on the County District Court not only in connection with proof of cases "within its jurisdiction" but also on the issue of jurisdiction as well. It follows that an equitable defense to the proof of an alleged rent default in a landlord-tenant dispossess proceeding is permissible and facts in support thereof admissible.

There is no logical reason why a tenant who is successful in having a case removed to the Superior Court under *N. J. S. A.* 2A:18–60 shall have the benefit of equitable defenses to jurisdiction while a tenant who is unsuccessful in

seeking to have his case removed from the County District Court to the Superior Court should be limited to legal defenses.[1]

[1]*N. J. S. A.* 2A:18–60 reads:
"At any time before an action for the removal of a tenant comes on for trial, either the landlord or person in possession may apply to the superior court, which may, if it deems it of *sufficient importance*, *order the cause transferred from the county district court to the superior court.*" (Emphasis supplied)

The statute furnishes no guidelines for the solution of the question of what constitutes a case of "sufficient importance." It is self-evident that every tenant removal is of importance to both the landlord and tenant. It could be argued that every such case qualifies for removal to the Superior Court. If a dispossess action is not removed to the Superior Court, appeal by a tenant from an adverse judgment is restricted to the issue of jurisdiction. *N. J. S. A.* 2A:18–59. If the action is removed to the Superior Court, appeal is not so restricted. Appeal is then available on meritorious grounds as well. *Vineland Shopping Center, Inc. v. DeMarco, supra.* We see no sound reason for any distinction between the right to appeal from a District Court judgment and a Superior Court judgment for possession. It might well be urged that there should be no difference between the scope of review from a District Court judgment and a Superior Court judgment. We are not, however, obliged to pass upon that problem in the matter *sub judice.*

We hold, therefore, that equitable as well as legal defenses asserting payment or absolution from payment in whole or part are available to a tenant in a dispossess action and must be considered by the court. Denial of a motion by defendant directed at the complaint for failure to make adequate factual allegations, or of a motion at the conclusion of the trial for failure to supply proof that the amount of rent alleged in the complaint is in default, both going to the question of jurisdiction, are each appealable.

Insofar as *Peters v. Kelly,* 98 *N. J. Super.* 441 (App. Div. 1968), conflicts with the foregoing it is overruled.

It becomes necessary to consider the merits of defendant's equitable defense that the failure of the landlord to repair the toilet constituted a breach of the covenant of habitability or quiet enjoyment and gave rise to defendant's

entitlement to self-help, permitting her to repair the toilet and offset the cost thereof against her rent. We need not concern ourselves with the covenant of quiet enjoyment as will hereafter become apparent.

We are here concerned with the lease of premises for residential purposes. The lease provides:

"WITNESSETH, that the said party of the first part hath let, and by these presents doth grant, demise and to farm let unto the said property of the second part, all that contains 4 rooms and bath, apartment situated in the city and county of camden [sic.], state [sic.] of New Jersey, known and designated as 503–B Rand Street.
\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
"nor use or permit any part thereof to be used for any other purpose than dwelling \* \* \*."

As the lease contains no express covenant to repair, we are obliged to determine whether there arises an implied covenant, however categorized, which would require the landlord to make repairs.

A lease was originally considered a conveyance of an interest in real estate. Thus, the duties and obligations of the parties, implied as well as express, were dealt with according to the law of property and not of the law of contracts. In *Michaels v. Brookchester, Inc.*, 26 *N. J.* 379 (1958) this Court said at *p.* 382:

"Historically a lease was viewed as a sale of an interest in land. The concept of *caveat emptor*, applicable to such sales, seemed logically pertinent to leases of land. There was neither an implied covenant of fitness for the intended use nor responsibility in the landlord to maintain the leased premises. *Bauer v. 141-149 Cedar Lane Holding Co.*, 24 *N. J.* 139, 145, 130 A. 2d 833 (1957) ; *Bolitho v. Mintz*, 106 *N. J. L.* 449, 148 *A.* 737 (*E. & A.* 1930). This principle, suitable for the agrarian setting in which it was conceived, lagged behind changes in dwelling habits and economic realities. 1 *America Law of Property* (1952), § 3.78, *p.* 347. Exceptions to the broad immunity inevitably developed."

The guidelines employed to construe contracts have been modernly applied to the construction of leases. 3 *Thompson*

*on Real Property* 377 (1959). See also 6 *Williston on Contracts, 3d ed. Jaeger,* § 890A, *p.* 592 (1962):

"There is a clearly discernible tendency on the part of the courts to cast aside technicalities in the interpretation of leases and to concentrate their attention, as in the case of other contracts, on the intention of the parties, * * *."

In *Pines v. Perssion,* 14 *Wis. 2d* 590, 111 *N. W. 2d* 409 (Sup. Ct. Wis. 1961), the court stated at *p.* 412:

"*Legislation and administrative rules,* such as the safeplace statute, building codes and health regulations, all impose certain duties on a property owner with respect to the condition of his premises. Thus, the legislature has made a policy judgment — that it is socially (and politically) desirable to impose these duties on a property owner — which has rendered the old common law rule obsolete. To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards. The need and social desirability of adequate housing for people in this era of rapid population increases is too important to be rebuffed by that obnoxious legal cliche, *caveat emptor.* Permitting landlords to rent 'tumbledown' houses is at least a contributing cause of such problems as urban blight, juvenile delinquency and high property taxes for conscientious landowners."

In *Reste Realty Corporation v. Cooper,* 53 *N. J.* 444 (1969), this Court said at *p.* 452:

"Moreover, an awareness by legislatures of the inequality of bargaining power between landlord and tenant in many cases, and the need for tenant protection, has produced remedial tenement house and multiple dwelling statutes. See *e. g., N. J. S. A.* 55:13A–1 *et seq.* and the regulations thereunder; see generally Fuerstein and Shustack, 'Landlord and Tenant — The Statutory Duty to Repair," 45 *Ill. L. Rev.* 205 (1950); Annotation, 17 *A. L. R.* 2d 704 (1951). It has come to be recognized that ordinarily the lessee does not have as much knowledge of the condition of the premises as the lessor. Building code requirements and violations are known or made known to the lessor, not the lessee. He is in a better position to know of latent defects, structural and otherwise, in a building which might go unnoticed by a lessee who rarely has sufficient knowledge or expertise to see or to discover them. A prospective lessee, such as a small businessman, cannot be expected to know if the plumbing or wiring systems are adequate or conform to local codes. Nor should he be expected

to hire experts to advise him. Ordinarily all this information should be considered readily available to the lessor who in turn can inform the prospective lessee. These factors have produced persuasive arguments for reevaluation of the *caveat emptor* doctrine and, for imposition of an implied warranty that the premises are suitable for the leased purposes and conform to local codes and zoning laws."

See also *Lemle v. Breeden,* 462 *P. 2d* 470 (Sup. Ct. Hawaii 1969).

A covenant in a lease can arise only by necessary implication from specific language of the lease or because it is indispensable to carry into effect the purpose of the lease. In determining, under contract law, what covenants are implied, the object which the parties had in view and intended to be accomplished, is of primary importance. The subject matter and circumstances of the letting give at least as clear a clue to the natural intentions of the parties as do the written words. It is of course not the province of the court to make a new contract or to supply any material stipulations or conditions which contravene the agreements of the parties. *Kampf v. Franklin Life Ins. Co.,* 33 *N. J.* 36 (1960); *Washington Construction Co., Inc. v. Spinella,* 8 *N. J.* 212 (1951); *City of Camden v. South Jersey Port Commission,* 4 *N. J.* 357 (1950); *McBride v. Maryland Casualty Co.,* 128 *N. J. L.* 64 (E. & A. 1942). Terms are to be implied not because

"they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them * * * or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable men, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto. See 12 *Am. Jur., Contracts, sec.* 239; 14 *Am. Jur., Covenants, Conditions and Restrictions, sec.* 14." *William Berland Realty Co. v. Hahne & Co.,* 26 *N. J. Super.* 477, 487 (Ch. 1953), modified 29 *N. J. Super.* 316 (App. Div. 1954).

See also *Silverstein v. Keane,* 19 *N. J.* 1 (1955); *Cragmere Holding Corp. v. Socony Mobile Oil Co.,* 65 *N. J. Super.* 322 (App. Div. 1961).

So here, the lease expressly described the leased premises as "4 rooms and bath, apartment" and restricted the use thereof for one purpose, — "dwelling." Patently, "the effect which the parties, as fair and reasonable men, presumably would have agreed on," was that the premises were habitable and fit for living. The very object of the letting was to furnish the defendant with quarters suitable for living purposes. This is what the landlord at least impliedly (if not expressly) represented he had available and what the tenant was seeking. In a modern setting, the landlord should, in residential letting, be held to an implied covenant against latent defects, which is another manner of saying, habitability and livability fitness. See *Hyland v. Parkside Investment Co., Inc.*, 10 *N. J. Misc.* 1148 (Sup. Ct. 1932). It is a mere matter of semantics whether we designate this covenant one "to repair" or "of habitability and livability fitness." Actually it is a covenant that at the inception of the lease, there are no latent defects in facilities vital to the use of the premises for residential purposes because of faulty original construction or deterioration from age or normal usage. And further it is a covenant that these facilities will remain in usable condition during the entire term of the lease. In performance of this covenant the landlord is required to maintain those facilities in a condition which renders the property livable.

It is eminently fair and just to charge a landlord with the duty of warranting that a building or part thereof rented for residential purpose is fit for that purpose at the inception of the term and will remain so during the entire term. Of course, ancillary to such understanding it must be implied that he has further agreed to repair damage to vital facilities caused by ordinary wear and tear during said term. Where damage has been caused maliciously or by abnormal or unusual use, the tenant is conversely liable for repair. The nature of vital facilities and the extent and type of maintenance and repair required is limited and

governed by the type of property rented and the amount of rent reserved. Failure to so maintain the property would constitute a constructive eviction.

It becomes necessary to consider the respective rights and duties which accompany such an implied covenant. We must recognize that historically, the landlord's covenant to alter or repair premises and the tenant's covenant to pay rent were generally regarded as independent covenants. The landlord's failure to perform did not entitle the tenant to make the repair and offset the cost thereof against future rent. It only gave rise to a separate cause of action for breach of covenant. *Duncan Development Co. v. Duncan Hardware, Inc.,* 34 *N. J. Super.* 293 at 298 (App. Div. 1955), cert. denied 19 *N. J.* 328 (1955); *Stewart v. Childs Co.,* 86 *N. J. L.* 648 (E. & A. 1914). This result also eventuated from the application of the law of real estate rather than of contract. The concept of mutually dependent promises was not originally applied to the ascertainment of whether covenants in leases were dependent or independent. However, presently we recognize that covenants are dependent or independent according to the intention of the parties and the good sense of the case. *Higgins v. Whiting,* 102 *N. J. L.* 279 (Sup. Ct. 1925); 3 *Thompson on Real Property,* § 1115 (1959 Replacement).

In *Higgins v. Whiting, supra,* the court said at *pp.* 280 and 281 concerning the test of dependency of express covenants:

"In 24 *Cyc.* 918, it is said that covenants are to be construed as dependent or independent according to the intention and meaning of the parties and the good sense of the case. Technical words should give way to such intention. 7 *R. C. L.* 1090, § 7. So, the rule is thus stated; where the acts or covenants of the parties are concurrent, and to be done or performed at the same time, the covenants are dependent, and neither party can maintain an action against the other, without averring and preving performance on his part. 13 *Corpus Juris* 567.

\* \* \* \* \* \* \* \*

"In the present case, the covenant to pay rent and the covenant to heat the apartment are mutual and dependent. In the modern

apartment house equipped for heating from a central plant, entirely under the control of the landlord or his agent, heat is one of the things for which the tenant pays under the name 'rent.' "

Our courts have on a case by case basis held various lease covenants and covenants to pay rent as dependent and under the guise of a constructive eviction have considered breach of the former as giving the right to the tenant to remove from the premises and terminate his obligation to pay rent. See *McCurdy v. Wyckoff,* 73 *N. J. L.* 368 (Sup. Ct. 1906); *Weiler v. Pancoast,* 71 *N. J. L.* 414 (Sup. Ct. 1904); *Higgins v. Whiting,* 102 *N. J. L.* 279 (Sup. Ct. 1925); *Stevenson Stanoyevich Fund v. Steinacher,* 125 *N. J. L.* 326 (Sup. Ct. 1940).

It is of little comfort to a tenant in these days of housing shortage to accord him the right, upon a constructive eviction, to vacate the premises and end his obligation to pay rent. Rather he should be accorded the alternative remedy of terminating the cause of the constructive eviction where as here the cause is the failure to make reasonable repairs. See *Reste Realty Corporation v. Cooper, supra,* footnote 1, 53 *N. J. pp.* 462, 463. This latter course of action is accompanied by the right to offset the cost of such repairs as are reasonable in the light of the value of the leasehold against the rent. His pursuit of the latter form of relief should of course be circumscribed by the aforementioned conditions.

 If, therefore, a landlord fails to make the repairs and replacements of vital facilities necessary to maintain the premises in a livable condition for a period of time adequate to accomplish such repair and replacements, the tenant may cause the same to be done and deduct the cost thereof from future rents. The tenant's recourse to such self-help must be preceded by timely and adequate notice to the landlord of the faulty condition in order to accord him the opportunity to make the necessary replacement or repair. If the tenant is unable to give such notice after a reasonable attempt, he may nonetheless proceed to repair or replace. This does not mean

that the tenant is relieved from the payment of rent so long as the landlord fails to repair. The tenant has only the alternative remedies of making the repairs or removing from the premises upon such a constructive eviction.

We realize that the foregoing may increase the trials and appeals in landlord and tenant dispossess cases and thus increase the burden of the judiciary. By way of warning, however, it should be noted that the foregoing does not constitute an invitation to obstruct the recovery of possession by a landlord legitimately entitled thereto. It is therefore suggested that if the trial of the matter is delayed the defendant may be required to deposit the full amount of unpaid rent in order to protect the landlord if he prevails. Also, an application for a stay of an order of removal on appeal should be critically analyzed and not automatically granted.

In the light of the foregoing we find it unnecessary to pass on defendant's other grounds of appeal.

Reversed and remanded for trial in accordance with the above.

*For reversal and remandment* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.